IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY ᵁᵁᵉ D.C.

05 JUN 16  PM 12: 32

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

| | | |
|---|---|---|
| DARIUS D. LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 96-2520 M1 |
| | ) | |
| SHELBY COUNTY, TENNESSEE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER AND OPINION PURGING DEFENDANTS OF CONTEMPT

On December 22, 2000, the Court issued an Opinion Finding
Defendants in Contempt of Court for failing to implement specific
steps ordered by Judge Turner in his orders of November 12, 1997,
and November 24, 1999, to correct the unconstitutional conditions
at the Shelby County Jail ("the Jail").[1]  Following the finding
of contempt, Defendants created a new remedial scheme that was
effectively adopted by the Court as the remedial plan to correct
the unconstitutional conditions at the Jail.  The Court held
hearings in this case on April 15, 2005, and on April 19, 2005,
to determine whether Defendants should no longer be held in

---

[1] Appendices A-K, which contain certain documents referenced in
this order and opinion are attached.  The order and opinion and the
appendices shall be accessible at http://www.tnwd.uscourts.gov for
five days following the entry of this order and opinion.  In addition,
the order and opinion and appendices shall be permanently accessible
at http://www.tnwd.uscourts.gov/JudgeMcCalla.

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 6-16-05


836

contempt of Court.[2]

The long history of unconstitutional conditions at the Jail

---

[2] In light of the provisions contained in § 3626(b) of the Prison Litigation Reform Act ("PLRA"), the Court initiated the purgation process and adopted a schedule to move Defendants toward purgation. Section 3626(b) of the PLRA provides:

> (1) Termination of prospective relief.--
> (A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener-
>> (i) 2 years after the date the court granted or approved the prospective relief;
>> (ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or
>> (iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.
> (B) Nothing in this section shall prevent the parties from agreeing to terminate or modify relief before the relief is terminated under subparagraph (A).
> (2) Immediate termination of prospective relief. -- In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
> (3) Limitation. -- Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.
> (4) Termination or modification of relief. -- Nothing in this section shall prevent any party or intervener from seeking modification or termination before the relief is terminable under paragraph (1) or (2), to the extent that modification or termination would otherwise be legally permissible.

18 U.S.C. § 3626(b).

during the period between 1987 and 2001 was conceded by the

Defendants.   The following quote from the report of Defendants'

expert, Dr. Jeffrey A. Schwartz, summarizes the conditions that

were present at the Jail:

> Prior to 2001, the Shelby County Jail had a twenty year
> history of abysmal leadership, mismanagement, nepotism
> and cronyism, low hiring standards and poor personnel
> practices, lack of staff training and other resources
> and a profound lack of concern, support or
> accountability from both the Sheriff's Office and the
> rest of the Shelby County government.  These factors
> produced an overcrowded jail that was dangerous for
> inmates and staff alike, a jail in which the living
> units were largely controlled by gangs and in which
> assaults, rapes, stabbings, escapes and suicides were
> relatively commonplace events.  The jail was filthy and
> in poor repair; staff were unprofessional with inmates
> and with each other and there was a well-established
> pattern of excessive force.  Food service, medical and
> mental health services were deplorable and other
> services such as inmate classification and inmate
> programming were dysfunctional or simply lacking.  The
> rest of the Shelby County Sheriff's Office had
> metaphorically disinherited the jail and its staff,
> routinely refusing to recognize them as part of the
> same organization.  The jail had not been certified by
> the Tennessee Corrections Institute (TCI) for many
> years and it is difficult to imagine how the jail's
> image in the community could have been much worse.

(Jeffrey A. Schwartz, A Review of the Shelby County Jail, March

2005, ("Schwartz Report"), Hearing Ex. 2, at 7.) (Docket No.

810.)  Until the December 22, 2000, Opinion Finding Defendants in

Contempt of Court, Defendants failed to take steps to remedy

these conditions.  (Id. at 59-60.)  Since the finding of

contempt, Defendants have developed and taken steps to implement

a new remedial scheme that has alleviated the unconstitutional

-3-

conditions at the Jail.  For the following reasons, the Court
FINDS that Defendants have PURGED themselves of contempt through
the implementation of this new remedial scheme.

## I.    Background and Procedural History

Plaintiff Darius Little, while incarcerated in the Jail on
September 27, 1995, was raped by three gang members who were also
incarcerated in the Jail.  No guard was present to prevent
Plaintiff from being raped.  In addition, during the time of
Plaintiff's incarceration, guards were rarely present to observe
the inmates.

The present case was filed on May 14, 1996, and alleged that
Plaintiff's civil rights were violated under 42 U.S.C. § 1983.[3]
The case was originally assigned to the late Honorable Jerome
Turner and was transferred to this Court on March 6, 2000.  On
September 12, 1996, Judge Turner issued a Consent Order in which
Defendants stipulated to their liability under § 1983 for
violation of Plaintiff's rights under the Eighth Amendment of the
United States Constitution.  (Consent Order Stip. Liab. for Inj.
Relief Purposes Only; and Estab. Proced. for Remedy, Sept. 12,

---

[3] In an order issued on April 14, 1998, the Court certified a
class of all persons who were at that time, or would in the future be,
incarcerated in the Shelby County Jail.  That order effected the
consolidation of two inmate rape cases and provided for the
implementation, monitoring and enforcement of injunctive
relief in this case.  (Consent Order of Apr. 14, 1998, Banks v.
Shelby County, No. 96-2874 (W.D. Tenn. filed Aug. 16, 1996.))  The
consolidated cases included Banks and Hill v. Shelby County, No. 96-
2622 (W.D. Tenn. filed June 17, 1996).

-4-

1996, (Docket No. 15).)

On November 12, 1997, the Court issued an Order Granting Injunctive Relief to Remedy Unconstitutional Conditions in Shelby County Jail and Findings of Fact and Conclusions of Law in Support of Order Granting Injunctive Relief to Remedy Unconstitutional Conditions in the Shelby County Jail ("Findings of Fact"). (Order Granting Inj. Relief to Remedy Uncons. Cond. in Shelby Co. Jail, Nov. 12, 1997, (Docket No. 55).); (Find. Of Fact and Concl. of Law in Supp. of Order. Granting Inj. Relief to Remedy Uncons. Cond. in Shelby Co. Jail, Nov. 12, 1997, (Docket No. 54).)

In his findings of fact, Judge Turner described the conditions at the Jail concerning population capacity, intake and classification of inmates, inmate supervision, noise level, gang activity, data collection and certification.[4]  (Find. Of Fact, Nov. 12, 1997, (Docket No. 54), at 3-5.)  Judge Turner found that the following factors would reduce the risk of violence and sexual assault in the Jail: (1) continual supervision of inmates; (2) properly classifying inmates, and separating inmates who are likely to assault other inmates; and (3) separating inmates who are likely to be victims of assault.  (Id. at 5-6.)  In addition, Judge Turner found that increased guard supervision would reduce

---

[4] Judge Turner's November 12, 1997, findings of fact are attached to this order and opinion as Appendix A.

the likelihood of physical and sexual assaults on inmates in the
Jail and that continuous twenty-four hour supervision of the cell
block should also reduce physical and sexual assaults in the
Jail.  (Id. at 6.)

The November 12, 1997, order required the Jail to make
several changes with respect to the manner in which it was
operated[5]:

> 1. <u>Classification</u>.  Within 90 days of the entry of this
> order, each inmate admitted to the Shelby County Jail
> will be confidentially interviewed by classification
> staff prior to such inmate's cell assignment to
> determine if such inmate has known enemies from whom he
> should be separated; protective custody needs; or gang
> involvement.  Information will be collected during the
> initial classification interview to determine if such
> inmate has assaulted other inmates during prior
> incarcerations, or has been a victim of an assault by
> another inmate during prior incarcerations, or fears he
> may be victimized by another inmate, or has gang
> affiliations or previous conviction for violent crimes.
> This information shall become part of an automated
> inmate information system, which shall be developed and
> implemented as soon as practicable, using good faith
> efforts but no later than nine months from the entry of
> this order to insure that potential victims are
> separated from known predators (i.e., inmates who have
> assaulted other inmates.)  All housing unit assignments
> will be made by classification staff only.  Within six
> months after the entry of this order, all staff
> assigned to classification will complete a course of
> classification interviewing training designed to insure
> compliance with this order.
>
> 2. <u>Housing</u>.  Any inmate who is classified as violent (a
> level V, VI, or VII on the current classification
> scale) shall never be housed in a cell with more than
> one other inmate.  Whenever it becomes necessary to
> assign two inmates to the same cell, classification

---

[5] The November 12, 1997, order is attached as Appendix B.

officers will not house potential victims with known
predators.  Furthermore, inmates classified as violent
(i.e., those indicated by a red dot on the wrist band
under the current classification system), and inmates
with a known history of violence, will not be housed
with inmates classified as nonviolent (indicated by a
blue, green, or yellow dot on the wristband, under the
current classifications).  When a compatible housing
assignment cannot be made, the inmate shall be housed
in a single cell.  As soon as reasonably possible, but
no later than nine months after the entry of this
order, the facility shall implement a policy requiring
single-celling for those inmates who have not yet been
fully classified.

3. <u>Inmates Supervision</u>.  A separate cell block officer
shall be continuously assigned to each of the cell
blocks in which inmates are incarcerated, on the lower
level of the current jail facility whenever any of the
cells in such cell block house two or more inmates.
Each cell block officer shall monitor the cell block to
he/she is assigned continuously to assure the inmates
housed together in the same cell are housed compatibly.
Only under documented emergencies involving risk of
safety to cell block officers or inmates will cell
block officers supervise more than two adjacent cell
blocks at a time, and shall only do so for the time
period necessary to resolve such emergency.  The
continuous monitoring required by this order shall be
implemented as soon as reasonably possible, but no
later than nine months from the date of entry of this
order.

4. Cell Block officers assigned to housing duties on
floors 2, 3 and 4 of the current jail facility will
also continuously supervise individual cell blocks in
which inmates are incarcerated to assure compatibility.
Cell block officers may only be removed from their
assigned cell blocks for documented emergencies
involving risks of safety to cell block officers or
inmates, and then only for the time period necessary to
resolve such emergency.  Under no circumstances shall a
cell block officer supervise more than two adjacent
cell blocks at a time.  It is the intent of this order
that there shall be a separate cell block officer
assigned at all times to supervise each cell block in
the current facility on floors 2, 3 and 4, when such
cell block houses inmates and are not totally locked

down for the entire shift. Every cell block shall have its own cell block officer continuously supervising such cell block except as otherwise allowed in this order. The continuous monitoring required by this order shall be implemented as soon as reasonably possible, but no later than nine months from the date of entry of this order.

5. Each cell block officer will insure that inmates are housed compatibly by frequent observation of behavior of inmates in the cell block such cell block officer is supervising, and by confidentially interviewing inmates in the cell block to determine if the inmate's cell assignment is safe. In addition, cell block officers will interview any inmate in the cell block who the cell block officer believes may be having compatibility problems with other inmates. Inmates identified as having potentially violent cell mate compatibility problems will be promptly separated and referred to classification for review.

6. In general population cells on the second, third and fourth floors, inmates will be permitted to move between their cell and the day room of the cell block during a five minute period each hour, unless such movement is otherwise restricted by jail operational procedures. During the remaining 55 minutes of the hour, the cell doors will remain locked. Inmates may remain in their cells, or the day room during those 55 minute periods. Cell block officers will continuously monitor the cells during these five minute periods when the cell doors are open to insure that no inmate enters a cell within the cell block to which such inmate is not assigned.[6]

7. Continuous direct observation of inmates by cell block officers is required during all out-of-cell activity in lock down and protective custody housing units.

(Order Granting Inj. Relief to Remedy Uncons. Cond. in Shelby Co. Jail, Nov. 12, 1997, (Docket No. 55), at 3-7.)

On November 24, 1999, Judge Turner issued a Consent Order

---

[6] This policy is known as the 55/5 policy.

Adopting Recommendations of Special Master, Final Order Granting Injunctive Relief as to Conditions in the Shelby County Jail.[7] The November 24, 1999, order mandated that the provisions in the November 12, 1997, order concerning classification, housing, and inmate supervision would remain in force until November 1, 2004. (Consent Order Adopting Recommendations of Special Master, Final Order Granting Inj. Relief as to Conditions in the Shelby Co. Jail, Nov. 24, 1999, (Docket No. 78), at 5.)  The November 24, 1999, order also required Defendants to modify their record keeping of violent incidents at the Jail.  (Id. at 5-6.)  In addition, it contained the following requirement regarding overtime:

> It is further ordered that defendants are forbidden to
> regularly use overtime to staff cell block officer
> positions required by the Court Order.  The defendants
> are to make good faith efforts to employ sufficient
> cell block officers to staff all positions required by
> the Court Order.  If due to exceptional reasons,
> overtime must be utilized to staff a position,
> voluntary overtime should be used before the use of
> mandatory overtime.  The defendants should in such
> cases use good faith efforts to cease using overtime to
> staff positions as soon as possible.

(Id. at 6.)  These additional requirements also remained in effect until November 1, 2004.  (Id. at 5.)

Plaintiff filed a Motion to Cite Defendants for Contempt of Court on June 29, 2000, and a Supplemental Motion to Cite Defendants for Contempt of Court on September 1, 2000.  On

---

[7] The November 24, 1999, order is attached as Appendix C.

December 22, 2000, the Court issued its Opinion Finding

Defendants in Contempt of Court.[8]  In particular, Defendants were

found to be in contempt of Court because they had failed to

comply with the provisions of the November 12, 1997, order

requiring single celling of inmates who were not fully

classified, adequate inmate supervision and compliance with the

55/5 policy.  (Op. Finding Defs. in Contempt of Court, Dec. 22,

2000, (Docket No. 233), at 43.)  In addition, Defendants were

held in contempt for failing to comply with the provision of the

November 24, 1999, order concerning the prohibition of the

regular use of overtime to staff Court-ordered posts.  (Id.)  The

opinion instructed the parties to submit short, intermediate, and

long-term remedial plans to correct the unconstitutional

conditions in the Jail.[9]  (Id.)

---

[8] The December 22, 2000, opinion is attached as Appendix D.

[9] In a related proceeding, the United States filed a complaint
against the Defendants pursuant to the Civil Rights of
Institutionalized Persons Act of 1980, 42 U.S.C. § 1997, seeking to
enjoin the Defendants from depriving persons incarcerated at the Jail
of rights, privileges, or immunities secured and protected by the
United States Constitution. United States v. Shelby County, No. 02-
2633 (W.D. Tenn. filed Aug. 12, 2002),  Complaint, Aug. 12, 2002,
(Docket No. 1).  After the parties entered into a Settlement
Agreement, the Court issued an order conditionally dismissing the case
and placed the case on the inactive docket pending Defendants'
compliance with the Settlement Agreement. United States v. Shelby
County, Order of Conditional Dismissal, Aug. 15, 2002, (Docket No. 3).
A copy of the Settlement Agreement is attached as Appendix I.  The
Settlement Agreement is also available at the United States Department
of Justice website at
http://www.usdoj.gov/crt/split/documents/shelby_settleagmt.htm.
Additionally, a Findings Letter issued by the United States on June
27, 2001, following an investigation of the Jail is attached as
                                                      (continued...)

## II.  Findings of Fact

Based on the entire record in this case, including the
purgation hearings held on April 15, 2005, and April 19, 2005,
the Court makes the following findings of fact on the issues now
before the Court.

The Shelby County Jail is a temporary detention facility for
individuals awaiting disposition of their criminal charges
pending in the criminal courts in Shelby County, Tennessee.
Convicted individuals are then transferred to either state or
county prison facilities to serve their sentences.  The Jail was
considered to be one of the worst urban jails in the United
States prior to 2001.  (Tr. at 30, 94-95, 123; Hearing Ex. 2, at
40.)  In fact, several cases have highlighted the
unconstitutional conditions existing within the Jail prior to
2001.  See Gilland v. Owens, sub nom. No. 87-2191 (W.D. Tenn.
filed Mar. 18, 1987);[10] Pulliam v. Shelby County, No. 92-2354

---

(...continued)
Appendix J.  The Findings Letter is also available at the United
States Department of Justice website at
http://www.usdoj.gov/crt/split/documents/shelbyfind.htm.

[10] Gilland was the preceding case involving, among other things,
inmate violence and overcrowding in the Shelby County Jail.  Judgment
was entered dismissing the case on July 7, 1993.  That case was a
class action that provided for implementation, monitoring and
enforcement of injunctive relief.  Moreover, the following case
numbers were consolidated in the class action: No. 87-2276; No. 87-
2273; No. 87-2429; No. 87-2341; No. 87-2348; No. 88-2924; No. 88-2095;
and No. 88-3004.

(W.D. Tenn. filed Apr. 20, 1992);[11] and <u>United States v.</u>

---

[11] In <u>Pulliam</u>, the Plaintiff alleged that he was attacked and beaten by approximately 10 inmates at the Jail on December 27, 1991. In the closing argument of the jury trial, Plaintiff's counsel stated the following concerning the attack on Plaintiff:

> But I want you to close your eyes and think about being Michael in that pod and being drug into the day room area. He was in the day room area and you heard Mike testify this is an open area, you heard each and every guard testify that they were supposed to have visual access of this area at all times, they were supposed -- and that it was critical for security for them to have access. Well, as Judge Gibbons found, I'm going to assert to ya'll that I believe that what happened was that the staffing wasn't adequate. Remember, we have got some testimony about the fact that those that were on the roster weren't exactly those that were actually there that day, so I choose to believe that they were understaffed and that's why nobody saw. But remember Mike testified he was brought out here where this A is and that's where he was jumped on by what, eight, ten inmates, them beating and beating and beating on him, them stomping and hitting him, and then he was pulled over here to this table where he was laid on his back and one of the people in that pod stood on the table and stomped and stomped and stomped on his hip until it broke.
>
> Now, ladies and gentlemen, I cannot imagine the terror of hearing my own bones being broken by someone else. I cannot imagine the terror in the helplessness of laying here and no one coming to get me, no one intervening. But that wasn't the end of it for Michael, he was drug from here -- he couldn't walk, his hip was broken, so he was drug over here into the shower area where they attempted to sexually assault him, where they urinated on him, where they committed indignities to that man that no man or woman should ever have to put up with. They stomped on his arm, ladies and gentlemen, they broke both the bones in his wrist. I'm not talking about a pencil like what ya'll have got in your hand, I'm talking about the bones of a full grown man and they broke them. But that wasn't the end of the terror for Michael, no. From here, remember, he was dragged further, dragged because he couldn't walk back to this bunk where someone, and it is undisputed that this happened, took off their clothes, put grease in their hand and started to attack him again. I cannot imagine the mind-set of Michael at that point, I cannot imagine it. All we do know is that that screaming was something that eventually caused him to be dragged back out into the day room area
> (continued...)

Marshall, No. 93-20117 (W.D. Tenn. filed Apr. 22, 1993).[12]   At

_____

(...continued)
again where he was kicked and kicked and kicked until he had
his ribs broken.  I submit to you, ladies and gentlemen, all
of that took a lot longer than 30 seconds.  Michael was
eventually taken out of the pod.  Michael's testimony is
that he laid here for some period of time, and we don't know
exactly how long he laid there, but the incident report that
ya'll have all seen said that this happened at about 11
minutes after 8:00 in the evening.  We do know that Michael
was taken to the Med and he got there at 10:13.  That's a
two hour-period, folks.  Mike had a hip trauma, he had a
very severe trauma.  That kind of trauma is attended to
immediately, and we know that it took them at least two
hours from the time it happened until the time he got there
for him to be treated.

Pulliam, Transcript from Trial Proceedings held Apr. 26, 1994, June
14, 1994, (Docket No. 106), at 15-17.
     On April 27, 1994, following the trial, the jury rendered a
verdict for Plaintiff and against Defendant, A.C. Gilless,
individually, in the amount of $895,000 in compensatory damages and
$109,500 in punitive damages, and against Defendant Shelby County in
the amount of $3,750,000 in compensatory damages.  Pulliam, Judgment,
Apr. 28, 1994, (Docket No. 90).

[12] Marshall involved a Jail Lieutenant who organized an ad hoc
group of jailers to beat certain juvenile pretrial detainees on
September 6, 1991.  Lt. Marshall and 6 deputy jailers were indicted
under 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).
     The 7-count indictment asserted in summary that:

          It was part of the plan and purpose of this conspiracy (to
          deprive the victims of the right to be free from the use of
          unreasonable force amounting to punishment by one acting
          under color of law) that the defendants would remove
          juvenile pretrial detainees, who were in cells and in the
          custody of the Shelby County Sheriff, from the cells in the
          P + Q pod area of the second floor of the Shelby County
          Jail....That the defendants, after removing these prisoners
          a few at a time, would assault and beat them in the hallway
          adjacent to the P + Q pod....That this beating would be
          accomplished with fists, shot feet, riot sticks, and stun
          guns.

Marshall, Indictment, Count 1, at 2-3.
     It was further alleged that, after the beatings:

          On the afternoon of September 6, 1991, defendants Belinda
                                                    (continued...)

-13-

that time there was a high risk of violence and rape, gang

control was pervasive, and institutional control was poor.[13]

-----

(...continued)
>     Marshall and Glynn Bridgeforth and another co-conspirator
>     agreed to have the officers involved prepare reports
>     concerning the beatings which falsely stated that the
>     inmates attacked the officers with weapons.

Id. at 4.
     Of the four defendants who went to trial, 3 were convicted and
sentenced to substantial periods of imprisonment (51 months, 63
months, and 120 months for Bridgeforth, Tines, and Marshall
respectively).   The Sixth Circuit Court of Appeals affirmed their
convictions on November 29, 1995.  United States v. Tines, 70 F.3d 891
(6th Cir. 1995).   The Sixth Circuit opinion noted that: "None of the
inmates [selected to be beaten] had participated in the earlier fight
with the new inmates [the asserted justification for the beatings
organized by Lt. Marshall]."  Id. at 894.   The injuries to the inmates
were summarized as follows:

>     The six inmates suffered abrasions, contusions, and
>     lacerations. Among other injuries, Adams suffered a
>     fractured humerus; Chaney suffered a broken nose and
>     fractured ribs; Coleman suffered a fracture of the medial
>     wall between the eye socket and the nose; and Owens suffered
>     retinal hemorrhaging as well as broken bones in both his
>     nose and eye socket.

Id.

     [13] The lack of administrative control within the Jail is
illustrated by widespread guard-to-inmate drug smuggling as
evidenced by a federal "sting" operation in 1991 and
institutional loss of control is illustrated by riots that
occurred in the summer of 1991.  Specifically, on August 7, 1991,
twenty-seven individuals, twenty-two of whom were then employed at the
Jail, were indicted by a federal grand jury as a result of a federal
investigation concerning individuals who were paid by inmates to
smuggle contraband, such as cocaine base and dilaudid, into the Jail.
See James Chisum and Chris Conley, Jail Chaplain, Others Dealt Inmates
Drugs, Charges Say, The Commercial Appeal, (Memphis, TN), Aug. 8,
1991, at A1, available at LEXIS, News Library, Newspaper Stories,
Combined Papers.   Those individuals were charged in the following
cases: United States v. Johnson et al., No. 91-20196 (W.D. Tenn. filed
Aug. 7, 1991); United States v. Harmon, No. 91-20197 (W.D. Tenn. filed
Aug. 7, 1991); United States v. Lane, No. 91-20198 (W.D. Tenn. filed
Aug. 7, 1991); United States v. Wooten, No. 91-20199 (W.D. Tenn. filed
                                                    (continued...)

-14-

(Tr. at 70, 128-29.)  Since the finding of contempt, however, the Jail has undergone a remarkable turnaround[14] that has resulted in

(...continued)
Aug. 7, 1991); United States v. Brownlee, No. 91-20200 (W.D. Tenn. filed Aug. 7, 1991); United States v. Harmon, No. 91-20201 (W.D. Tenn. filed Aug. 7, 1991); United States v. Smith, No. 91-20202 (W.D. Tenn. filed Aug. 7, 1991); United States v. Irving, No. 91-20203 (W.D. Tenn. filed Aug. 7, 1991); United States v. Hudson, No. 91-20204 (W.D. Tenn. filed Aug. 7, 1991); United States v. McNeal, No. 91-20205 (W.D. Tenn. filed Aug. 7, 1991); United States v. Key, No. 91-20206 (W.D. Tenn. filed Aug. 7, 1991); United States v. Holton, No. 91-20207 (W.D. Tenn. filed Aug. 7, 1991); United States v. Rogers, No. 91-20208 (W.D. Tenn. filed Aug. 7, 1991); United States v. Chambers, No. 91-20209 (W.D. Tenn. filed Aug. 7, 1991); United States v. Tate, No. 91-20210 (W.D. Tenn. filed Aug. 7, 1991); United States v. Currie, No. 91-20211 (W.D. Tenn. filed Aug. 7, 1991); United States v. Thompson et al., No. 91-20212 (W.D. Tenn. filed Aug. 7, 1991); United States v. Nunn, No. 91-20213 (W.D. Tenn. filed Aug. 7, 1991); United States v. Stillman, No. 91-20214 (W.D. Tenn. filed Aug. 7, 1991); United States v. Chiles, No. 91-20215 (W.D. Tenn. filed Aug. 7, 1991); United States v. Burton, No. 91-20216 (W.D. Tenn. filed Aug. 7, 1991); United States v. Hall, No. 91-20217 (W.D. Tenn. filed Aug. 7, 1991); United States v. Richards, No. 91-20218 (W.D. Tenn. filed Aug. 7, 1991); United States v. Jackson, No. 91-20219 (W.D. Tenn. filed Aug. 7, 1991); and United States v. Harris, No. 91-20220 (W.D. Tenn. filed Aug. 7, 1991).
    On June 22, 1991, inmates rioted and, for a period of time, controlled part of the fourth floor of the Jail.  Joey Senat and Lawrence Buser, Downtown Inmates Riot Over Quality of Breakfast, The Commercial Appeal (Memphis, TN), June 23, 1991, at A1, available at LEXIS, News Library, Newspaper Stories, Combined Papers.  Two months later, on August 17, 1991, the Jail experienced a major riot where inmates took control of the fourth floor for approximately eight hours.  James Chisum, Eight-Hour Riot Rocks Jail; Damage Heavy to 4th Floor; Some Prisoners Transferred, The Commercial Appeal (Memphis, TN), Aug. 18, 1991, at A1, available at LEXIS, News Library, Newspaper Stories, Combined Papers.  That riot briefly spread to the third floor of the Jail.  Id.

    [14] Despite the progress that has been made, the Jail continues to experience problems with the smuggling of contraband into the facility.  On March 8, 2005, seventeen individuals, fourteen of whom were current and former deputy jailers, were indicted for smuggling drugs into the Jail.  Those individuals were charged in the following cases: United States v. Williamson, No. 05-20066 (W.D. Tenn. filed Mar. 8, 2005); United States v. Williamson, et al., No. 05-20071 (W.D. Tenn. filed Mar. 8, 2005); United States v. Williamson, et al., No. 05-20075 (W.D. Tenn. filed Mar. 8, 2005); United States v. Williamson, et al., No. 05-20076 (W.D. Tenn. filed Mar. 8, 2005); United States v.
                                                    (continued...)

a drastic reduction in the levels of violence and gang control that were once prevalent.[15]   (Tr. at 19, 33, 95, 119, 175; Hearing Ex. 2, at 40; Hearing Ex. 3.)

After the finding of contempt, Defendants developed and undertook steps to implement a new remedial scheme that included numerous components that, when executed in combination, have

---

(...continued)
Williamson, et al., No. 05-20077 (W.D. Tenn. filed Mar. 8, 2005); United States v. Reed, No. 05-20067 (W.D. Tenn. filed Mar. 8, 2005); United States v. Grant, No. 05-20068 (W.D. Tenn. filed Mar. 8, 2005); United States v. Grant, et al., No. 05-20072 (W.D. Tenn. filed Mar. 8, 2005); United States v. Grant, et al., No. 05-20073 (W.D. Tenn. filed Mar. 8, 2005); United States v. Grant, et al., No. 05-20074 (W.D. Tenn. filed Mar. 8, 2005); United States v. Grant, et al., No. 05-20078 (W.D. Tenn. filed Mar. 8, 2005); United States v. Springer, No. 05-20069 (W.D. Tenn. filed Mar. 8, 2005); and United States v. Boyland, et al., No. 05-20070 (W.D. Tenn. filed Mar. 8, 2005).

    [15] Defendants' expert, Dr. Jeffrey A. Schwartz, testified that the level of gang violence has reduced substantially, that gang activity is almost undetectable, and that Jail staff, instead of gangs, now control the living units.  (Tr. at 19.)  In making these findings, Dr. Schwartz relied on, among other things, inmate interviews and Jail incident reports.  (Id.)  Some of the interviews were conducted separately by himself, and some were conducted jointly with Charles Glover Fisher, V., an expert in the field of corrections who is the Special Master in this case.  (Id.)
    Dr. Schwartz further testified that, after interviewing inmates on every floor of the Jail, none of them said they had been threatened, had difficulty sleeping, worried about being attacked, had been attacked, were pressured for commissary goods, telephone time, or sex, or that they experienced any of the other conditions consistent with gang control of living units in the Jail.  (Tr. at 19-20.)  His findings were corroborated by the fact that some of the inmates who were interviewed had stayed in the Jail on previous occasions and described the dangerous conditions and extensive gang violence and control that once existed at the Jail.  (Tr. at 20.)
    Mr. Fisher similarly testified that the level of violence at the Jail has decreased substantially and that gang control is nonexistent.  (Tr. at 119, 175; Hearing Ex. 3.)  He further testified that inmates he interviewed said they felt safe and saw no gang activity in the Jail.  (Tr. at 119)  Mr. Fisher interviewed inmates from all sections of the Jail, including the third and fourth floors, where most of the gang members are housed.  (Id.)

-16-

improved the conditions at the Jail.  (Tr. at 34, 70, 95, 130,
164-65.)  These components include direct supervision in the cell
blocks, improved population management, the collection and
utilization of data, the installation of an objective
classification system, improved control of gang members through
the creation of a Gang Intelligence Unit, improved inmate
discipline and prosecution of inmate crimes committed within the
Jail, the creation of a separate Disturbance Response Team, the
provision of adequate inmate services, the creation of an
effective grievance procedures, improved staff training, improved
security, efforts to obtain certification and accreditation, the
creation of programs and activities to reduce inmate idleness,
and improved leadership.  The continued development and
implementation of each of these components is critical to
maintaining the current constitutional conditions at the Jail.
Moreover, the failure to continue implementing any single
component could be detrimental to the Jail's ability to operate
at a constitutional level.  (Tr. at 164-65.)  The Court will
discuss these individual components in turn.

### A.   Direct Supervision

The Jail is a poorly designed facility.[16]   This poor design makes it difficult to operate the Jail securely and efficiently. (Tr. at 36-37.)   The poor design also makes it possible for inmates to escape observation from staff members.   (Tr. at 131-32.)

Prior to 2001, the Jail employed a method of supervision called indirect supervision, which for all practical purposes, resulted in little or no meaningful supervision.   (Tr. at 37, 132; Hearing Ex. 2, at 61.)   Under this system, deputy jailers did not wish to go into the cell blocks unless they were accompanied by other jailers or they had no choice.   (Tr. at 38.) In addition, observation of inmates through a small window in the back of each cell from the "catwalk" was not effective for numerous reasons.[17]   (Tr. at 37-38.)   Dr. Schwartz opined that this lack of supervision contributed to the pervasive gang

---

[16] The Jail contains pods, or cell blocks, which are groups of 23 cells.  A central corridor, called the day room, separates the two rows of cells inside an individual pod.  (Tr. at 36.)  A catwalk accessible to the Jail staff also runs behind the row of cells.  (Tr. at 37.)  For the purpose of this order, the Court uses the terms "pod" and "cell block" interchangeably.

[17] For example, inmates would often cover the window to prevent observation, the windows would often be badly scratched and the lights inside the cell would often be out or covered.  (Tr. at 37-39.)

control and gang violence in the Jail prior to 2001.[18]  (Tr. at 39.)

The Court heard testimony concerning the central role direct supervision now plays in reducing the level of violence and gang control in the Jail.  Direct Supervision requires a staff member of a correctional facility to work directly with inmates inside the living unit.  (Tr. at 35.)  In particular, the staff member is permanently stationed inside the living unit for the duration of a shift.  (Id.)

After the Court issued its opinion finding Defendants in contempt, the Jail, after a period of delay, implemented direct supervision.  Direct supervision is practiced at the Jail by locking a deputy jailer inside each of the regular cell blocks during the two day shifts when the inmates are allowed out of their cells and into the day room, a communal area between the two rows of cells in each cell block.  (Tr. at 36, 39-40, 133-34, 139-40.)  During the night shift, when inmates are locked down in their individual cells, direct supervision is not practiced and instead one deputy jailer supervises three cell blocks.  (Tr. at 42-44, 133-34.)

---

[18] Mr. Fisher testified that gang activity occurred in the cell blocks when deputy jailer left their posts.  (Tr. at 139.)  The record further reflects that although deputy jailer's were at one time stationed in the hallway in front of the cell blocks, gang  activity would nonetheless occur when the jailers either did not pay attention, left their posts, or simply could not see because of the poor sight lines.

The Court received proof demonstrating that direct
supervision has played a critical role in reducing the level of
violence and gang control in the Jail because it places guards in
a better position to observe what is transpiring inside the cell
block.  (Tr. at 21-22.)  Under a system of direct supervision, it
is more difficult for inmates to commit violent acts or sexual
assaults because deputy jailers are in the shared common area and
can immediately respond.  (Tr. at 46, 140-41.)  Furthermore, by
interacting with the inmates inside the cell block, deputy
jailers can detect potential disputes between inmates and
intervene before those disputes escalate into violence.  (Tr. at
47, 141.)  The presence of deputy jailers inside the cell blocks
also provides inmates with an excuse not to fight other inmates.
(Tr. at 141.)

Under a system of direct supervision, deputy jailers also
act more like managers of the individual cell blocks.  (Tr. at
46, 158.)  In this capacity, it is important that they provide
inmates with information and basic services, including, among
other things, food, maintenance, counseling, chaplaincy, and
medical and mental health services.  (Tr. at 46-48, 160.)  The
ability to provide these services impacts the quality of direct
supervision; when those services are poor or unavailable, the
credibility and management ability of the deputy jailer stationed
inside the cell block is undermined.  (Tr. at 48, 158-60.)

-20-

Conversely, when the deputy jailer is able to provide these services, the level of violence in the Jail is reduced.[19]   (Tr. at 46-48, 159-60.)

### B.   Population Management

Population management has played a critical role in reducing the level of violence at the Jail.  (Tr. at 48, 143-44.)   The Court heard testimony demonstrating that as a correctional facility becomes more crowded, management of the facility becomes more difficult and the risk of violence, inmate disturbances and riots increases.  (Tr. at 49, 143-44.)   In the Shelby County Jail, for instance, it is much more difficult to control gangs or violence when the Jail has 3,000 inmates as opposed to 2,000 inmates.  (Tr. at 21, 142; Hearing Ex. 2, at 62.)

Following the contempt finding, the County began a concerted effort to develop population management information.  (Tr. at 49.)  As a result of this effort, the Jail currently produces monthly Population Management Reports which include data on, among other things, the average daily population at the Jail, the total number of inmates booked, the total number of inmates released, the average length of stay at the Jail, booking process time and the total number of inmates in the Jail with cases

---

[19] Dr. Schwartz specifically testified during the hearings that providing necessary maintenance services in a timely manner is important in reducing the level of violence in the Jail, but that "[t]he link between poor maintenance services and violence is probably indirect and ... would be hard to specify."  (Tr. at 46-47.)

pending in General Sessions Courts and Criminal Courts broken down by the booking date and offense type.  The report identifies when and why there are backups in moving the inmate population through the Jail.[20]  (Tr. at 85.)  Data contained in the reports is shared with state criminal court judges during monthly meetings that focus on population management.  (Tr. at 85-86.)

The Jail also now employs a jail population management analyst to facilitate the County's population management effort.[21]  (Tr. at 142.)  The population management analyst works with the population data that is collected, examines individual inmate cases and meets with judges and representatives from the offices of the District Attorney General and Public Defender to try to move particular cases through the Jail.  (Tr. at 142-43.)  In addition, the population management analyst works with pretrial services in an effort, where appropriate, to obtain lower bonds or move particular inmates out of the Jail.  (Tr. at 143.)  Mr. Fisher testified that the efforts of the population

_____

[20] For instance, Sheriff Mark H. Luttrell, Jr. testified that when a significant number of inmates have stayed in the Jail for an extended period of time, the jail population management analyst makes inquiries with the District Attorney General's office and the Public Defender's office to determine what is delaying particular cases. (Tr. at 85.)

[21] Initially, Ms. Kim Hackney served as the jail population management analyst.  (Tr. at 142.)  Currently, Ms. Chris Kirby is serving in this position.  (Id.)  The creation of the jail population management analyst position and the employment of Mr. William Powell, the county Criminal Justice Coordinator, have been essential in implementing the County's population management effort.

-22-

management analyst have been very helpful in reducing the jail population.  (Id.)

Overpopulation has the potential to undermine much of the progress that has been made in remedying the unconstitutional conditions that once existed in the Jail.[22]  The following quote from Dr. Schwartz's report is illustrative of the importance of population management:

> Without the heavy emphasis on population management over the last four years, it is reasonable to conclude that almost everything in the jail would be significantly more difficult.  Most importantly, lowering population pressures has directly helped prevent violence.

(Hearing Ex. 2, at 63.)

### C.  Collection and Utilization of Data

The collection and utilization of data is essential to the effective operation of a detention facility.  Prior to 2001, data collection at the Jail was essentially non-existent.  (Hearing Ex. 2, at 66; Tr. at 154.)  Since the contempt finding, the Jail has made progress in collecting and utilizing data to track conditions at the Jail.  Dr. Schwartz testified that the Jail now

---

[22] Mr. Fisher testified that he is concerned by the steady increase in the jail population from approximately 1,700 inmates to between 2,200 or 2,250 inmates.  (Tr. at 179.)  He further testified that the causes for the population increase were that inmates were arrested of more serious crimes, obtained higher bonds, and experienced longer stays in the Jail than in the past.  (Id.)  Mr. Fisher testified regarding the negative effects a continuing increase in the jail population could have on the progress made at the Jail. (Id.)  Mr. Fisher also testified that the County was acting aggressively to keep the Jail population low.  (Tr. at 180.)

uses data to a higher degree than any jail he has worked with in the United States.[23]   (Tr. at 26.)

One example of how data is currently utilized at the Jail is the Jail Report Card - a monthly report that provides statistics on Jail operations and activities.[24]   (Tr. at 84.)   Through this report, problems within the Jail are identified.   (Tr. at 155.) The information contained in the Jail Report Card is reviewed at monthly meetings attended by Shelby County Sheriff Mark H. Luttrell, Jr.   During these meetings individual managers explain any variances in numbers concerning their areas of operation. (Tr. at 84.)   Sheriff Luttrell testified that the Jail Report Card is used both as a tool to monitor conditions at the Jail and to hold managers accountable for their areas of operation.   (Id.)

### D.   Objective Classification[25]

In the past, the Jail had no effective classification system.   (Hearing Ex. 2, at 64.)   The Jail had difficulty obtaining information that was necessary to properly and quickly

---

[23] Mr. Fisher testified that although the Jail has improved its data collection and reporting, the analysis of the data that is collected needs to improve.   (Tr. at 122, 155.)   Mr. Fisher further testified that although the County is addressing this issue, it will take some time for improvements in analysis to occur because most staff at the Jail are not experienced in performing data analysis.   (Tr. at 122-23.)

[24] The Shelby County Sheriff's Office April 2005 Jail Report Card, filed on June 13, 2005, is attached as Appendix G.

[25] The Court received testimony during the purgation hearings demonstrating that over 50,000 inmates are booked into the Jail per year.   (Tr. at 27.)

-24-

classify inmates.[26]   (Tr. at 148.)   Under the prior
classification system, an inmate receiving a high security level
classification could nonetheless be assigned to a floor that was
inappropriate for that inmate given the inmate's classification.
(Tr. at 147-48.)   As a result, a highly violent, predatory inmate
could be, and often was, housed with an inmate who was likely to
be victimized.[27]   (Tr. at 55; Hearing Ex. 2, at 64.)

---

[26]   In Gilland v. Owens, No. 87-2191 (W.D. Tenn. filed
Mar. 18, 1987), the Court made the following finding of fact regarding
the prior classification system:

> Under the current system, jail officials simply do not
> obtain and utilize much information pertinent to a
> determination of whether an individual is violent or
> nonviolent.   The conclusion is inescapable that there is no
> effective separation of violent and nonviolent inmates.

Gilland v. Owens, 718 F.Supp. 665, 673 (W.D. Tenn. 1989).
     Classification, of course, remained a central problem even after
the December 22, 2000, finding of contempt (Op. Finding Defs. in
Contempt of Court, Dec. 22, 2000, (Docket No. 233), at 27-34) and
until the implementation of a new objective classification system.
During the purgation hearings held in April of 2005, the Court also
heard testimony indicating that before the implementation of the new
classification system, classification personnel were unable to
directly access the National Crime Information Center ("NCIC")
database in order to obtain an individual's prior criminal history.
(See Tr. at 148.)

[27]  The Court heard testimony concerning a stop-gap measure
implemented by the County between approximately 2000 and 2001 that was
effective in assigning new inmates to either violent or nonviolent
booking in the intake area at the lower level of the Jail.   (Tr. at
21, 56-57.)   Under this system, violent and nonviolent inmates were
separated into two parallel corridors in the lower level of the Jail
after they were fingerprinted and identified.   (Tr. at 57.)   Inmates
were separated based on their arrest and conviction history, if such
information was available during booking, as well as their arresting
offense.   (Id.)   This system could have been implemented in the Jail
at any time, and, certainly, could have been implemented well before
2000 or 2001.   (Tr. at 58.)

-25-

Since the finding of contempt, the County has implemented a modern objective classification system that utilizes more data in determining an individual's classification.[28] (Tr. at 61, 148.) Under this system, an inmate's initial classification is regularly reviewed based on that inmate's current institutional behavior to insure that the inmate is properly classified.[29] (Tr. at 59-60.) For instance, if an inmate is involved in a violent incident, then the inmate is reviewed and often receives a higher security level classification. (Tr. at 60.) Dr. Schwartz testified that the objective classification system has been effective in separating the most dangerous inmates from those that are the least dangerous. (Tr. at 21.)

**E.    Gang Control**

Prior to 2001, gang control was prevalent in the pods at the Jail. Gangs maintained their own organizational structure, created and enforced their own rules, organized brawls, forced non-gang members to fight gang members for sport and intimidated

---

[28] During the purgation hearings, Dr. Schwartz testified that there was an error in his report concerning the County's decision to abandon use of a recently purchased classification system. (Tr. at 55-56.) In his report, Dr. Schwartz specifically noted that the County "purchased a proprietary classification system and shortly thereafter decided to abandon it in favor of the system in place at the Corrections Center, which was available free." (Hearing Ex. 2, at 64.) Dr. Schwartz testified, however, that the County reversed the above decision, and that the previously purchased Northpoint Classification System is being utilized at the Jail. (Tr. at 56, 60.)

[29] In addition, under this new system, a terminal is now located in classification that provides direct access to the NCIC database.

-26-

both inmates and staff.  (Op. Finding Defs. in Contempt of Court,
Dec. 22, 2000, (Docket No. 233) at 16-20.)  An example of the
degree of gang control and intimidation is the murder of Sergeant
Dedrick Taylor on April 19, 1996.[30]  (Id. at 20.)  During this
time, the Jail had no effective gang unit to reduce gang control.
Although the Jail maintained a Gang Task Force, that task force
consisted of one officer who gathered, but did not otherwise
report or act upon, information concerning gang membership,
organization and activity.  (Op. Finding Defs. in Contempt of
Court, Dec. 22, 2000, (Docket No. 233) at 21.; Tr. at 53, 144-
45.)

The Jail now has a Gang Intelligence Unit ("GIU") that
collects and utilizes data to control and monitor gang activity.
(Tr. at 54, 146.)  In general, the GIU examines Jail admissions
and identifies known gang members.  (Tr. at 51, 145.)  During

---

[30] On April 19, 1996, Sergeant Taylor was murdered by gang members
at his home pursuant to an order issued from a telephone inside a pod
within the Jail.  State v. Thompson, No. W1998-00351-CCA-R10-CD, 2001
WL 912715, at *1, *3 (Tenn. Crim. App. Aug. 9, 2001).  The phone call
was made by Charles Thompson, a high-ranking member of a gang called
the Traveling Vice Lords, following a verbal altercation he had with
Sergeant Taylor in the Jail.  Id. at *1.  Thompson called Verico
Jackson, another high-ranking member of the Traveling Vice Lords, and
stated that he wanted Sergeant Taylor killed and wanted news of the
killing to appear on television the next morning.  Id.  Jackson then
later told other gang members to kill Sergeant Taylor.  Id.  Sergeant
Taylor was subsequently shot several times when he pulled into his
driveway and died from the gunshot wounds.  Thompson, 2001 WL 912715,
at *1.  A copy of the opinion from the Tennessee Court of Criminal
Appeals is attached as Appendix H.  This opinion is also available at
the Tennessee Administrative Office of the Courts website at
http://www.tsc.state.tn.us/OPINIONS/tcca/cc3qtr2001.htm.

this process, gang members seen as a serious threat are placed in administrative segregation, while other gang members are tracked.[31] (Tr. at 52.) The GIU also examines violent incidents to determine whether there was gang involvement,[32] regularly interviews inmates, and receives telephone calls providing information regarding gang activity through a hotline from telephones in the cell blocks. (Tr. at 52, 145.) In addition, the GIU, when able,[33] works with law enforcement units charged with investigating gang activity outside the Jail. (Tr. at 145-46.)

---

[31] Gang members in the Jail currently maintain a low profile because it is well known that individuals identified as gang members will be placed into administrative segregation. (Hearing Ex. 2, at 63-64; Tr. at 125.)

[32] For instance, the GIU examines whether groups of inmates were acting as a gang or placing gang pressure on inmates or staff. (Tr. at 52.) The staff at GIU also looks at whether the individuals involved in a particular incident were known gang members. (Id.) If known gang members were, in fact, involved in an incident, they may be separated from the general population and placed in a lock down unit. (Id.)

[33] The Court received testimony concerning the impact rising absenteeism is having on Jail units such as the GIU. (Tr. at 175-77.) Absenteeism causes other staff members to be pulled away from units such as the GIU, the disciplinary section, the grievance section and the DRT to cover for those employees not arriving to work. (Tr. at 175-76.) Absenteeism has at least once caused the GIU to fall behind on its investigations and has also caused booking time to increase significantly. (Tr. at 175.)
Mr. Fisher testified that approximately 90-100 people per day have recently been absent from work at the Jail. (Tr. at 176.) This figure represents approximately a 30% increase from absenteeism levels a year ago. (Id.) Mr. Fisher testified that continued absenteeism could disrupt the ability of the Jail to operate effectively. (Tr. at 176; Report of Special Master, Apr. 11, 2005, Hearing Ex. 3.)

**F.    Inmate Discipline and Prosecution of New Crimes**

The Jail had no effective system to discipline and prosecute inmates prior to 2001.  Often disciplinary hearings on inmate cases were not heard due to staff shortages in the Disciplinary Section.  (Tr. at 151.)  Other inmate cases were often delayed and many inmates were either released or transferred from the Jail before their cases were heard.  (Hearing Ex. 2, at 64.)  In addition, inmates who committed infractions in the Jail often did not serve their sentences because very little space was available for disciplinary segregation.  (Hearing Ex. 2, at 64.)  As a result, an inmate committing an infraction often waited to receive a segregation bed or was released or transferred without serving his sentence.  (Id.)  With respect to prosecution, the severity of conduct required to prosecute a case was very high.  (Hearing Ex. 2, at 64-65.)  Moreover, there were few investigations and subsequent referrals to the District Attorney General's Office.[34]  (Id. at 65.)

Several changes have since occurred with respect to the inmate disciplinary and prosecutorial system.  The Jail has designated an additional living unit for disciplinary segregation housing, devoted more staff resources to disciplinary hearings

---

[34] In his report, Dr. Schwartz noted that, prior to 2001, investigators from the enforcement division of the Sheriff's office did not want to perform investigations at the Jail.  (Hearing Ex. 2, at 65.)  When such investigations took place, follow up and referral to the District Attorney General's office were rare.  (Id.)

and changed policies regarding the disciplinary hearing process.[35]   (Hearing Ex. 2, at 65.)   In addition, inmates committing serious offenses are immediately transferred to administrative segregation pending the outcome of their disciplinary hearing and are kept there if they are found guilty. (Id.)

The Jail has also created a General Investigative Bureau ("GIB") that works with staff at the District Attorney General's Office to prosecute inmates who commit infractions in the Jail. The GIB investigates all incidents that could constitute a potential crime and refers cases to the District Attorney General's office for prosecution.  (Tr. at 150; Hearing Ex. 2, at 65.)  The existence of the GIB has had a positive impact on staff morale at the Jail.  (Tr. at 62; Hearing Ex. 2, at 65.)  In addition, the existence of the GIB has created a disincentive for inmates to perform violent acts because inmates are aware that they will be prosecuted and will receive additional time for any infractions they commit in the Jail.  (Tr. at 62, 150-51.)  The active prosecution of inmate infractions at the Jail has also improved the ability of deputy jailers to supervise inmates. (Tr. at 151-52.)

---

[35] But see supra note 33.

### G.    Disturbance Response Team

Prior to 2001, the Disturbance Response Team at the Jail was
comprised of deputy jailers already assigned to staffing posts.
(Tr. at 156.)   Therefore, when a disturbance arose, these jailers
had to vacate their assigned posts in order to respond to the
emergency.   (Id.)   In addition, the DRT did not have the
equipment or training necessary to perform their job effectively
and did not conduct random searches of the various cell blocks in
a systematic manner.   (Tr. at 158.)

As presently constituted, the DRT is a freestanding unit
that is called whenever there is any physical confrontation in
the Jail.[36]   (Tr. at 63, 156.)   The DRT is deployed in small
groups through various areas of the Jail and maintains its
visibility by walking around the floors, visiting with deputy
jailers, performing random searches of cell blocks to control
contraband and obtain gang information and by providing escorts.
(Hearing Ex. 2, at 68; Tr. at 64, 156-57.)   The existence of the
DRT facilitates direct supervision because it assures staff that
if a dangerous situation in the cell block arises, there will be
an immediate response from a unit capable of taking physical
control of that situation.   (Tr. at 63-64, 156.)   In addition,
the DRT also provides a deterrent to inmates who contemplate

---

[36] Mr. Fisher testified that the DRT is freestanding except in
situations when some of its members must be placed on a post due to
staffing shortages.   (Tr. at 156; see supra note 33.)

creating a violent incident or disturbance because inmates are aware that a well-equipped and well-trained unit exists to immediately respond to any such incident or disturbance. (Tr. at 64, 156-57.)

### H.   Inmate Services

The unavailability or inadequacy of inmate services such as food, maintenance, counseling, chaplaincy, sanitation, medical and mental health services can have a negative impact on inmate morale and increases the risk of violence in a correctional facility.[37] (See e.g., Tr. at 65-66, 123-24, 159-60.) In addition, as previously discussed, the ability to provide adequate inmate services also significantly impacts the degree to which direct supervision can be successfully practiced. (Tr. at 48, 158-60.)

Prior to 2001, food, maintenance, medical and mental health services were deficient at the Jail. (Hearing Ex. 2, at 68; Tr. at 123, 160.) In particular, maintenance and food service were consistently substandard. (Id.) In addition, medical and mental health services lacked adequate resources and inmates often failed to receive treatment. (Hearing Ex. 2, at 68.) Since 2001, Defendants have taken steps to improve these services.

---

[37] For instance, a correctional facility faces a serious risk of a disturbance when food and medical services are poor. (Tr. at 65.) Moreover, the provision of poor mental health services may result in a facility experiencing unnecessary assaults or preventable suicides. (Tr. at 66.)

(Hearing Ex. 2, at 69; Tr. at 123.)  The continued provision of proper inmate services such as food, maintenance, counseling, chaplaincy, sanitation, medical and mental health services is critical to the effective operation of the Jail.

## I.   Grievance Procedures

It is essential for a correctional facility to maintain an effective inmate grievance procedure so that the facility can monitor potential problems, so inmates can make complaints regarding treatment or services in the facility, and so that valid inmate concerns can be addressed.  (Hearing Ex. 2, at 19; Tr. at 161.)  Prior to 2001, there was no grievance procedure in place at the Jail.  (Tr. at 163.)  Currently, a grievance procedure exists and is initiated when an inmate completes a grievance form that is signed off by a deputy jailer.  (Tr, at 162.)  The form then goes to the grievance office and from there it is sent to the particular section that is the subject of the grievance.  (Tr. at 162-63.)  An answer is then given to the inmate and the inmate has an opportunity to appeal that answer. (Tr. at 163.)  Although there have been several problems with the current grievance procedure, the Court heard testimony concerning changes aimed at making the procedure more effective that were scheduled to take place on May 1, 2005.[38]  (Tr. at 163-64.)

---

[38] These changes include limiting the number of grievances inmates are allowed to file within a given 30 day period, shortening the
(continued...)

-33-

### J.    Staff Training

Prior to 2001, there was no effective staff training at the Jail.  (Tr. at 22-23.)  Since that time, the level of staff training has improved.[39]  (Tr. at 23, 120.)  The training is professional and there have been improvements in the classroom facilities, atmosphere, staff, instructors and the curriculum.[40] (Tr. at 23.)

### K.    Security

The Court received testimony indicating that the security in the Jail has dramatically improved since the finding of contempt. (Tr. at 29.)  Improved security within the Jail is the result of many components working in concert.  Those components are discussed in the following sections of this order and opinion: Sections II. A. Direct Supervision; B. Population Management; C. Collection and Utilization of Data; D. Objective Classification;

---

(...continued)
response time to 10 days and disciplining staff or vendors who do not timely respond to grievances.  (Hearing Ex. 3.)

[39] Dr. Schwartz testified that he was unable to observe academy training for new hires and his testimony was therefore limited to the regular in-service 40 hour training received by staff at the Jail. (Tr. at 22.)  He further testified that the training at the Jail looks very good compared to what he has observed nationally in Jails and prisons.  (Tr. at 23.)  While Dr. Schwartz' assessment may be somewhat optimistic, it is clear that there has been significant improvement in training for staff at the Jail.  But see supra note 14.

[40] Dr. Schwartz testified that almost all of the Jail staff to whom he had spoken had participated in training when it was deficient and now provided positive reviews concerning both the current in-service training and the specialized training for supervisors and management.  (Tr. at 23.)

-34-

E. Gang Control; F. Inmate Discipline and Prosecution of New Crimes; G. Disturbance Response Team; H. Inmate Services; I. Grievance Procedures; J. Staff Training; L. Certification/Accreditation; M. Inmate Idleness; and N. Leadership.  Mr. Fisher testified that the security in the Jail can now be characterized as good.[41]  (Tr. at 120.)

## L.   Certification/Accreditation

After an inspection from the Tennessee Corrections Institute ("TCI") on August 19, 1988, the Jail received a recommendation of non-certification and the TCI Board of Control approved the recommendation of non-certification and decertified the Jail on October 18, 1988.[42]  During the 15 years between 1988 and 2003,

---

[41] Mr. Fisher also explained that there remains room for improvement regarding security within the Jail.  (Tr. at 120.)

[42] The Tennessee Corrections Institute ("TCI") is required under Tennessee Code Annotated § 41-4-140 "to establish minimum standards for local jails, lock-ups, workhouses and detention facilities in the state and conduct an annual inspection of each facility."  TENN. COMP. R. & REGS Ch. 1400-1-.01(1) (2004).  The Shelby County Jail was recommended for non-certification in 1988 because it did not have enough staff, had poor classification, and maintained a "pod representative" system whereby prisoners were allowed to supervise each other in violation of TCI's minimum standards.  The Minutes of the TCI Board of Control October 18, 1988, meeting, as well as other public documents maintained by TCI are attached as Appendix K. Chapter 1400-1-.16(5) of the Rules of the Tennessee Corrections Institute concerns prisoner supervision and specifically provides that "[p]risoners shall not be permitted to supervise, control, assume or exert authority over other prisoners."  TENN. COMP. R. & REGS Ch. 1400-1-.16(5) (2004).

The "pod representative" system, also described as the "pod boss" system, was referenced in a number of public records maintained by TCI.  In particular, this system was referenced in the TCI County Inspection Reports prepared in connection with the following inspections of the Jail: August 19, 1988 (noting non-compliance with
(continued...)

every TCI annual inspection resulted in a "non-certification"
recommendation.  On October 8, 2003, the Jail received a
recommendation for certification, and the Board of Control
approved the recommendation for certification on January 29,
2004, and certified the Jail as being in compliance with TCI
minimum standards.

The Jail also has never received accreditation from the
American Correctional Association ("ACA").  (Tr. at 187.)  The
record shows that the County is moving toward obtaining

---

(...continued)
Chapter 1400-1-.16(5) and stating that "[t]he facility has begun a
program of designating 'pod representatives' to maintain order in the
housing areas.  These representatives, who are inmates[,] assign
clean-up jobs, set pod rules[,] and, presumably, discipline prisoners
who break the pod rules."); June 27-28, 1989, and July 5-6, 1989
(noting non-compliance with Chapter 1400-1-.16(5)); June 11-13, 1990
(noting non-compliance with Chapter 1400-1-.16(5), that "[t]he 'Pod
Boss' system remains in effect with one inmate or group of inmates
setting pod rules and dispensing punishment," that "[a]ccording to
posted rules, punishment can include such things as loss of telephone
time or food," and that adequate supervision should be provided "so
that 'Pod Boss' System is eliminated."); May 4-5 1993, and May 7, 1993
(noting non-compliance with Chapter 1400-1-.16(5) and that "pod bosses
must be removed"); December 18-19, 1995 (noting non-compliance with
Chapter 1400-1-.16(5)); December 9-12, 1996 (noting non-compliance
with Chapter 1400-1-.16(5) and that "[t]he facility has a program of
designating pod representatives, to maintain order, in the housing
areas.  These representatives, who are inmates, assign clean up jobs,
set pod rules and seem to discipline prisoners who break the pod
rules."); and August 1, 2001 (noting non-compliance with Chapter 1400-
1-.16(5)).  In addition, a document prepared on March 10, 1989, by TCI
entitled "Report on the Status of the Shelby County Jail," noted that
"[p]ods are still run by inmates who are known as "pod
representatives."  The above documents are attached as Appendix K.
    The information contained in the above documents concerning the
"pod representative" system is consistent with the findings made
regarding gang control of the pods in the December 22, 2000, Opinion
Finding Defendants in Contempt of Court.  See supra pages 26-28.

accreditation and that it appears that the Jail is "on track" to receive ACA accreditation.  (Tr. at 187; Hearing Ex. 2, at 31.)

### M.   Inmate Idleness

Inmate idleness is a serious problem that enhances the risk of violence in the Jail.  It is therefore essential for the Jail to develop and maintain programs so that inmates have an opportunity to participate in constructive activities.  (Hearing Ex. 2, at 47.)  The record shows that since the finding of contempt, the Defendants have taken steps to implement programs and activities to reduce inmate idleness at the Jail. Specifically, Defendants have developed and maintained an Alcohol and Drug Program; a General Equivalency Diploma ("GED") course; an Anger Management Program; a MCS Education Program; a Life Skill Program; a DUI Program; a Moral Reconation Therapy Program; a Stop the Violence Program; a Cross Cultural (Spanish) Program; and other special programs.[43]

### N.   Leadership

The current Sheriff and Jail leadership have been a key part in the dramatic turnaround[44] that has taken place in the Jail.[45]

---

[43] The Shelby County Sheriff's Office April 2005 Jail Report Card, attached as Appendix G, contains additional information concerning participation in the above programs.

[44] During the pendency of the Jail cases, there have been serious problems at the highest leadership levels of the Shelby County Sheriff's Department.  Two incidents from the Jail's history are illustrative.

(continued...)

-37-

(...continued)
     On May 5, 1990, former Sheriff Jack Owens committed suicide.
Louis Graham, FBI Scoured Sheriff's Dept. From '89; Laundry List of
Dirty Dealings Alleged, The Commercial Appeal, (Memphis, TN), Aug. 9,
1998, at A1, available at LEXIS, News Library, Newspaper Stories,
Combined Papers.   A local newspaper article further noted that "[t]he
FBI began surreptitiously recording conversations to prove a 'pattern
of illegal activities' as early as October 1989, first targeting
Sheriff Jack Owens, then others in the department after his suicide."
Id.
     On April 18, 1996, Alton Ray Mills, the Chief Deputy of the
Shelby County Sheriff's Department, and Stephen D. Toarmina, a "Staff
Special Deputy," were indicted by a federal grand jury on eighteen-
counts for conduct associated with the sale of deputy sheriff's
positions in the Shelby County Sheriff's Department.   The indictment
specifically charged Mills and Toarmina with conspiracy, bribery,
extortion, and money laundering in violation of federal law.   The
indictment "alleged that during the relevant time period, Toarmina
approached various individuals and obtained between $3,500 and $3,930
from them in exchange for a promise that Mills, referred to as 'the
man downtown,' would then hire them to fill open employment slots as
full-time, commissioned deputy sheriffs."   United States v. Mills, 140
F.3d 630, 631 (6th Cir. 1998).   Mills and Toarmina were subsequently
convicted on numerous counts and sentenced to periods of imprisonment
of 37 months and 39 months respectively.
     Mills began his employment with the Shelby County Sheriff's
Department in September of 1986 as Chief Administrative Officer in the
Owens Administration.   In September of 1990, Mills was named Chief
Administrative Officer in the newly elected administration of A.C.
Gilless and later served as Sheriff Gilless's Chief Deputy from July
of 1991 to March of 1998.   Prior to his employment with the Shelby
County Sheriff's Department, Mills had served as a president, general
manager, and sales manager at various car dealerships.   In addition,
Mills had worked as a deputy sheriff for approximately one year.


     [45] In his report filed on April 5, 2005, Dr. Schwartz stated the
following regarding the leadership of the current Sheriff and Jail
administration:

                 The current Sheriff has provided very strong positive
                 leadership for the jail.   It is fortuitous and most helpful
                 that he is a career corrections professional with
                 outstanding personal credentials managing correctional
                 institutions.

                 During the Sheriff's election campaign two years ago, the
                 first plank in Mark Luttrell's platform was a commitment to
                 straighten out the Shelby County Jail.   From the time of his
                 election, Sheriff Luttrell has done just that.   He has
                                                          (continued...)

The record reflects that the current leadership has provided
support, technical assistance and direction throughout the
process of implementing the remedial scheme necessary to alter

_____

(...continued)
> provided leadership in ways that are both obvious and
> subtle.  He tours the jail with some regularity, talking
> with front line jail staff and inmates alike and modeling
> that behavior for other managers in the Sheriff's Office.
> The Sheriff attends several different jail management or
> monitoring meetings each month.  The consultant observed
> different meetings of this sort and the Sheriff strikes a
> difficult balance between supporting his jail administrators
> and avoiding micro-management on the one hand while still
> asking key questions and providing strong direction and even
> technical advice on the other.  Sheriff Luttrell has
> insisted that everyone within the Sheriff's Office recognize
> the jail and its staff as an integral and co-equal part of
> the Sheriff's Office, and also insisted that they be treated
> with respect.  Few things have made a greater difference
> over the last few years for the jail staff.
>
> The jail has an excellent management team.  The Chief and
> the two Assistant Chiefs have quite different strengths and
> styles, which they use to compliment each other.  That three
> person team works very well together and they demonstrate
> leadership, procedural knowledge of the business, support,
> strong accountability, integrity and an excellent work ethic
> to the rest of the work force.  The jail Chiefs have a huge
> agenda and many day to day problems they cannot avoid, and
> it was poignant to hear one of them describe how difficult
> it is to have to discipline and terminate too many staff and
> still maintain a positive leadership direction.
>
> It would be remiss not to also mention the major leadership
> contribution of former Jail Chief Joe Ponte who resigned
> last year but worked in the jail during the three years of
> most extraordinary change.  Chief Ponte created change the
> old fashioned way, one staff member at a time, and one
> procedure at a time.  He trained, supervised, cajoled,
> disciplined, motivated and otherwise moved staff to levels
> of performance that many, including this consultant, thought
> they could not attain.  He also molded them into a team.
> His work, particularly with supervisors and managers in the
> living units and on the floors of the jail, was a primary
> factor in the jail's progress.

(Hearing Ex. 2, at 60-61.)

-39-

the unconstitutional conditions at the Jail.[46]  The current Jail
staff have in turn responded to the demands placed on them in a
professional way and with improved performance.  (Tr. at 26-27.)

## III. Standard of Review

In determining whether Defendants have complied with an

---

[46] In addition, Dr. Schwartz made the following comments in his
report regarding the leadership efforts of county Criminal Justice
Coordinator, William Powell; county Health Director, Yvonne Matlock;
and the County Administrative Officer, Jim Kelly, and his Deputy,
Ernie Gunn:

> Bill Powell, the county Criminal Justice Coordinator, agreed
> to coordinate the change efforts at a time when there was
> little commitment to change the jail and when that seemed
> like an assignment which could end any career.  Bill has
> chaired the weekly high level coordination meeting for four
> years now, tracking progress with the court compliance plan
> and DOJ, establishing landmarks and timelines, sending
> agendas in advance and minutus after each meeting, always
> focusing on accountability and achievement.  Bill has
> provided leadership and professionalism of the highest
> caliber and his quiet interventions to stop personality
> conflicts or overcome interagency disputes have been
> invaluable.
>
> Yvonne Matlock, the county Health Director, has supported
> the change agenda at the jail from the beginning[.]  When
> there has been a crisis with health or mental health issues,
> and there have been many, she has been immediately
> accessible and has provided strength, integrity and an
> unwavering focus on public health values with the jail
> population.
>
> In 2000 and 2001, Jim Kelly and Ernie Gunn, the County
> Administrative Officer and his Deputy, respectively,
> recognized that the jail debacle could prove disastrous for
> Shelby County government as a whole, when many others still
> did not see that.  They used the good offices of the County
> Administrative Officer to do anything they could to support
> change at the jail.

(Hearing Ex. 2, at 70.)

order of the Court, the Court considers whether "the defendants took all reasonable steps within their power to comply with the court's order," which includes whether the defendants have "marshal[ed] their own resources, assert[ed] their high authority, and demand[ed] the results needed from subordinate persons and agencies in order to effectuate the course of action required by the [court's order]." Glover v. Johnson, 934 F.2d 703, 708 (6th Cir. 1991).

## IV. Analysis

As previously noted, prior to 2001, the Jail was a dangerous place with high levels of violence and rape, and pervasive gang control.  Today, the Jail is a safer institution for both inmates and staff; violence and gang activity within the Jail have been brought under control.

These changes have occurred as a result of Defendants' implementation, and continued implementation, of a remedial scheme that was created over a period of time following the Court's December 22, 2000, finding of contempt.[47]  The Court

---

[47] As previously noted, the December 22, 2000, opinion finding Defendants in contempt instructed the parties to submit short, intermediate, and long term remedial plans to correct the unconstitutional conditions in the Jail.  (Op. Finding Defs. in Contempt of Court, Dec. 22, 2000, (Docket No. 233), at 43.)  After abandoning previously filed short, intermediate, and long term plans, Defendants filed a revised compliance plan on April 9, 2001.  (Notice of Filing Revised Shelby County Jail Compliance Plan, Apr. 9, 2001, (Docket No. 347).)  No expert asserted, however, that this plan, if it was implemented without modification, would remedy the unconstitutional conditions at the Jail.  (Order, June 21, 2001,
(continued...)

-41-

finds that the substantial reductions in violence and gang control at the Jail have resulted from the development and interaction of interdependent components that comprise a de facto fourteen (14) point remedial scheme.  These components are (1) direct supervision in the cell blocks; (2) improved population management; (3) collection and utilization of data; (4) installation of an objective classification system; (5)improved control of gang members through the creation of a Gang Intelligence Unit; (6) improved inmate discipline and prosecution of inmate crimes committed within the Jail; (7) creation of a separate Disturbance Response Team; (8) provision of adequate inmate services; (9) creation of an effective grievance procedure; (10) improved staff training; (11) improved security; (12) efforts to achieve certification and accreditation; (13) creation of programs and activities to reduce inmate idleness; and (14) improved leadership.  Each of these fourteen components has been essential to creating and maintaining constitutional conditions within the Jail.[48]

_____

(...continued)
(Docket No. 436), at 3.)  The April 9, 2001, revised compliance plan is attached as Appendix E to this order and opinion and the June 21, 2001, order is attached as Appendix F.

[48] Appendix B and Dr. Schwartz's report filed on April 5, 2005, (and particularly his "What Has Worked" section beginning on page 59 of that report) are perhaps the most useful discussions of the remedial scheme implemented in this case.

Shelby County has achieved constitutional compliance not through adherence to symptom-based remedial provisions, but rather through a focused, systemic and information-driven structural reform based on critical expert assessment of essential institutional functions.  This fourteen point structural reform scheme was narrowly drawn, extended no further than necessary to correct the violation of the federal right, and was the least intrusive means necessary to correct the violation of the federal right.  The evidence received during the purgation hearings demonstrated that Defendants are, in fact, no longer following the steps required by the prior Court orders.[49] Rather, in consultation with the Court, the Court's Special Master Charles Glover Fisher, V.,[50] and the County's own retained experts Dr. Jeffrey A. Schwartz and Dr. Pat Gaston, the Defendants have taken all reasonable steps within their power to

---

[49] For instance, the testimony received during the purgation hearings demonstrated that Defendants were not staffing the night shift as required by the November 12, 1997, order (Docket No. 55).  In addition, no proof was presented demonstrating that Defendants were single celling inmates who were not yet fully classified or complying with the 55/5 provision of the November 12, 1997, order.

There was also no proof demonstrating that Defendants substantially complied with the requirements of the November 24, 1999, order (Docket No. 78) prohibiting the regular use of overtime to staff certain positions.  Instead, testimony was presented concerning the negative impact rising employee absenteeism has had on operations within the Jail.  Although the Jail has currently achieved constitutional compliance, continued and systemic absenteeism has the potential to cause the Jail to revert to an unconstitutional state.

[50] The Assistant Special Masters, Wanda J. Kilgore-Schneider and Curtis J. Shumpert, have also played important roles in the remediation of conditions in the Jail.

(1) fashion an effective remedy (the fourteen point remedial scheme) and (2) implement that remedy.  See Glover, 934 F.2d at 708.  It is by this creative and determined approach that Sheriff Luttrell and Shelby County have marshaled their resources, purged themselves of contempt, and achieved constitutional compliance.

**V.    Conclusion**

For the foregoing reasons, the Court FINDS that Defendants have PURGED themselves of contempt of the Court orders through the development and implementation of the fourteen point remedial scheme.


So ORDERED this _16_th day of June, 2005.

JON P. McCALLA
UNITED STATES DISTRICT JUDGE


-44-

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 836 in case 2:96-CV-02520 was distributed by fax, mail, or direct printing on June 16, 2005 to the parties listed.

---

Kathleen Spruill
COUNTY ATTORNEY'S OFFICE
160 N. Main Street
Ste. 660
Memphis, TN 38103

Robert L. Hutton
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Arthur E. Horne
HORNE GILLULY & WELLS, PLLC
81 Monroe Ave.
Ste. 400
Memphis, TN 38103

Murray B. Wells
HORNE GILLULY & WELLS, PLLC
81 Monroe Ave.
Ste. 400
Memphis, TN 38103

Adam F. Glankler
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Brian L. Kuhn
SHELBY COUNTY ATTORNEY'S OFFICE
160 N. Main Street
Ste. 660
Memphis, TN 38103

Financial Unit
FINANCIAL UNIT
167 N. Main St.
Room 242
Memphis, TN 38103

Debra L. Fessenden
SHELBY COUNTY ATTORNEY'S OFFICE
160 N. Main Street
Ste. 660
Memphis, TN 38103

Honorable Jon McCalla
US DISTRICT COURT